CONSTANT Q. RING

*v.*

NEW AUDITORIUM PIER COMPANY et al.

[Decided September 9th, 1910.]

1. While *cestuis que trustent* are what are termed "necessary" parties to suits to foreclose a trust deed, failure to make them parties does not invalidate the foreclosure decree, so that the holder of corporate bonds was not entitled to have a decree foreclosing a trust deed on corporate property set aside because he was not a party to the proceedings, especially where it was not shown that any property subject to the lien was omitted from the foreclosure, or that his interest was not fully protected; the utmost which he could claim being that the foreclosure did not affect his rights.

2. A party defendant to a mortgage foreclosure is not, as a matter of law, entitled to notice of the time and place of the sale; he being required to use diligence to ascertain such facts.

3. Even if a holder of corporate bonds was entitled to have a decree foreclosing a trust deed on corporate property set aside, because he was not a party to the proceedings, he was not entitled to such relief, where it appeared that he was advised before the sale by the trustee that the latter had been requested to foreclose, thus notifying him that a foreclosure was probable, and was afterwards notified that the sale had taken place, the amount realized, and his part thereof, but did not attempt for many months thereafter to have the foreclosure decree set aside, during which interval it had become impossible to restore the status existing before the sale because of the leasehold interest, upon which the mortgage was, having expired shortly after the sale, and new leases to other parties having been made, and various stocks and bonds having been issued and new corporations formed to purchase the mortgaged property, and to guarantee the new bonds.

4. A bondholder of a corporation was entitled to be made a party defendant to a suit to foreclose mortgages on corporate property.

5. Where, though a corporate bondholder was given an opportunity to enter into an arrangement with the other bondholders, for the purpose of

selling mortgaged corporate property under foreclosure, buying it in, and accepting proportionate shares in a new mortgage of the same property, knowledge of the pendency of the suit was concealed from him by the trustee and other parties interested, and he was not notified thereof until after the sale, such bondholder was entitled to share in the new security created under such arrangement to the same extent as the other bondholders who were notified of the foreclosure proceeding and made defendants therein, upon paying his proportionate share of the expense of the scheme to substitute the securities.

6. The fact that such bondholder did not institute suit for such relief for many months after the foreclosure sale will not bar his right to relief, where no one has in the meantime changed his position, and no rights of others have been affected by his delay.

7. The chancery court has complete jurisdiction with respect to trusts.

8. The chancery court has complete jurisdiction to relieve from fraud in proper cases.

9. If other corporate bondholders and the trustee under corporate mortgages fraudulently conspired together to defraud another bondholder of his rights under the mortgage, by having it foreclosed without notice to to him, and without making him a party to the foreclosure proceedings under a scheme to buy in the property at the foreclosure sale, and to create a new security and issue new bonds, such bondholder will be entitled to equitable relief to protect his right in the new securities created.

Heard on bill, answers, replications and proofs in open court.

This is a bill filed by Constant Q. Ring against the New Auditorium Pier Company, the Pier Corporation of New Jersey, the Pier Company of New York, William H. Brearley, who was trustee under certain mortgages, Everett P. Hervey and George C. Tilyou.

Constant Q. Ring was a bondholder of the New Auditorium Pier Company, Brearley being trustee of the mortgage. The mortgage was foreclosed and Ring was not made a party to the suit. The property was bought in at the foreclosure sale (of which Ring had no notice) by the Pier Corporation of New York, a corporation whose whole capital stock is owned by the Pier Corporation of New Jersey. This last-named corporation was formed by or on behalf of all the other bondholders of the New Auditorium Pier Company, the agreement among them being that they should get bonds of the Pier Corporation of New Jersey, guaranteed by a New York corporation called the

Steeplechase Company, in exchange for their holdings in the New Auditorium Pier Company.

The object of the bill is either to have the sale in the foreclosure suit set aside and the complainant herein admitted a party therein, and to have a resale, or to have the complainant decreed to be entitled to equities with respect to the bonds issued by the Pier Corporation of New Jersey.

The answers of the various defendants set up the facts which each defendant alleges bar the complainant from obtaining any relief.

The facts as found will appear in the opinion.

*Messrs. McDermott & Enright,* for the complainant.

*Messrs. Northrop & Griffiths,* for the Pier Corporation of New York, Pier Company of New Jersey, Everett P. Hervey and George C. Tilyou.

*Mr. Charles D. Thompson,* for William H. Brearley, trustee.

GARRISON, V. C. (after statement of facts).

Ring was the owner of $5,000 of the bonds of the New Auditorium Pier Company, a corporation which had an outstanding mortgage of $75,000, of which William H. Brearley was trustee.

The corporation owned a lease upon a pier in the city of Atlantic City, New Jersey, and erected buildings which, in 1908, were appraised at $40,000, and had some personal property of the value of $1,000 or more, and was engaged in an amusement enterprise on this pier. The enterprise was not successful financially, and the interest due in January of 1907 was defaulted upon.

Tilyou, one of the defendants, is a man who runs Steeplechase Park at Coney Island, and who has been interested in amusement enterprises all over the country, and was one of the original, if not the original creator and promoter of this New Auditorium Pier Company; and Mr. Hervey, a New York lawyer, another defendant, had been interested very shortly after the incorporation of the New Auditorium Pier Company

in the enterprise, and had placed among his friends some twenty-five thousand dollars, at least, of the bonds of the New Auditorium Pier Company.

After the failure to pay interest in January of 1907, Mr. Hervey conceived the idea of getting Mr. Tilyou to have a solvent company of his (the Steeplechase Company), owning a large amusement enterprise at Coney Island, guarantee the holders of the bonds of the New Auditorium Pier Company, but not to have him guarantee the particular bonds which were then outstanding and were in default, but to form a 'new company and have a new issue of bonds by the new company, which new company should own the same property as the New Auditorium Pier Company, and then exchange its bonds, which would be guaranteed by the Steeplechase Company, for the bonds of the New Auditorium Pier Company.

Mr. Hervey visited the various bondholders of the New Auditorium Pier Company and secured the assent and co-operation of $67,000 out of $75,000 thereof. Shortly after the 21st of March, 1907, he visited Mr. Ring, who is a claim agent for a railroad and who had an office in the South Station, Boston. There is some dispute between the witnesses as to what took place at this interview. There is no dispute that Mr. Hervey opened this question of the exchange to Mr. Ring and suggested the desirability of his making it, and that Mr. Ring was not ready at that time to say either "yes" or "no." There is a dispute as to whether Mr. Hervey told Mr. Ring that if he did not come in the property would have to be sold in foreclosure proceedings; Mr. Ring testifies that he told him that if such was the case he (Hervey) would give him (Ring) thirty days' notice prior to any such sale. While this latter language is not denied verbatim by Mr. Hervey, I think it is denied by implication, because he testifies that at that interview they did not talk at all about having a sale.

Mr. Hervey came back to New York and wrote a letter under date of April 24th, 1907, to Mr. Ring, which, he says, practically repeated (perhaps more at length and with greater specification) the. things which he had said to him in the interview to which I have just alluded.

Mr. Ring made no response to this letter.

The general purport of this letter was that a new corporation was to be formed whose bonds were to be guaranteed by the Steeplechase Company; that they were to be identical with the bonds of the New Auditorium Pier Company which Ring now holds—that is, they were to cover the same property, and be for the same amount, and bear the same rate of interest, and payable at the same time; the idea being, as expressed in the letter, that the bondholders would then have an identical bond upon the identical property plus the guarantee of the Steeplechase Company.

It was intended that the new issue, instead of being $75,000, should be $110,000, and that the balance of the bonds might be sold for improvements.

As before stated, Ring did not respond to this letter, and, in the meantime, Hervey and Tilyou had caused to be incorporated a company in New Jersey called the Pier Corporation of New Jersey, all the stock of which was issued to the Steeplechase Company, which latter company was controlled absolutely by Tilyou. The Pier Corporation of New Jersey executed what is called a debenture agreement or debenture trust agreement, with William H. Brearley as trustee. I cannot see, from reading this agreement, that it vests anything in the trustee at all. It may, but I am not able to see that it did. It provided that these debentures, which are evidently the same things which Mr. Hervey had been writing and talking about and calls "bonds," might be issued up to the amount of $110,000, and that they were to be guaranteed by the Steeplechase Company.

On the 10th of July, 1907, Mr. Brearley wrote a letter to Mr. Ring, informing him that holders of sixty-seven out of seventy-five bonds of the New Auditorium Pier Company had requested him, Brearley, as trustee, to commence a foreclosure.

Some time in the summer of 1907—probably in August—this foreclosure was begun by Brearley, the trustee, under the direction and control of Mr. Hervey.

On the 25th of October, 1907, Ring came to New York, and visited both Hervey and Brearley. According to Ring's testimony that is the first time that he saw and had any conversa-

tion with Mr. Hervey since the conversation in April of 1907. Hervey does not dispute this, but says that he visited Mr. Ring at Ring's office in Boston some time in April after the interview that they did have, and sought another interview with him; that Ring must have known he was there, because, in Hervey's sight, a messenger went from Hervey to Ring, but Ring declined to see him. Ring absolutely denies this.

At the interview of the 25th of October just referred to there is again a dispute as between Hervey and Ring concerning the matter of a promise to give notice—Ring stating that Hervey told him that he did not know anybody that would take his bonds, and that the only thing he could do was to exchange them, and referred him to Brearley, trustee, saying that Brearley was Ring's trustee and would look out for him, but denying that he told Ring that he would give him notice of any foreclosure sale.

Ring went to see Brearley after seeing Hervey, and Brearley testifies that he told Ring that he had no news, that he could do nothing for him, but did not mention the foreclosure in any way.

It appears at this time that there was an interlocutory, if not a final, decree in the foreclosure suit, and of course they must have expected to have a sale. It seems almost incredible that no one mentioned the fact to him that there would be a sale and he would have to look out for himself; but both Hervey and Brearley testify that they did not tell him any such thing.

On the 13th of March, 1908, the mortgaged property was sold at Atlantic City by Pierre F. Cook, the special master. Previous to that time Mr. Hervey had caused to be incorporated in the State of New York a corporation called the Pier Corporation of New York, all of the stock of which was issued to the Pier Corporation of New Jersey, all of whose stock, it will be recalled, had been issued to the corporation (the 'Steeplechase Company) controlled by Tilyou, who was working in conjunction with Hervey and the trustee, Brearley. For purposes which do not affect the issues in this case in any way the New York corporation was formed, and it is admitted by the defendants that whatever it did it was as if done by the Pier Corporation of New Jersey.

The New York corporation constituted Mr. Thompson its attorney in fact, and authorized him to bid at the sale.

The foreclosure bill which was filed, as I have stated, some time in the summer of 1908, was filed by solicitors of the name of McCarthy & McMahon. Some time in the late summer or early fall Mr. Charles D. Thompson was consulted by Mr. Hervey, as the result of which Mr. Thompson was substituted as solicitor for the complainant, Brearley, the trustee, and he and Mr. Hervey (Hervey having been all the time acting in the matter as legal adviser of Mr. Brearley) managed the case from then on.

The final decree which had then been entered was opened at Mr. Thompson's request, and amendments were made to the bill, and on the 7th of December, 1908, a new final decree was obtained by Mr. Thompson in which the amount due upon the mortgage was determined to be $81,250.

At the sheriff's sale the trustee does not appear to have made any arrangements to take care of the property at all, excepting such as Mr. Hervey and Mr. Thompson, acting for him, had made by the incorporation of the New York company, and the authorizing of Mr. Thompson to go and bid. Mr. Thompson did bid, in the name of the New York corporation, the sum of $10,000, and the property was knocked down to him, and Mr. Hervey supplied the money to pay this.

On the 7th of April, 1908, after the sale was confirmed, Mr. Brearley wrote to Mr. Ring stating that there had been a foreclosure and a sale, and the amount that was received at the sale, and that his, Ring's, portion of it was $128 per bond, or $640 for his $5,000 of bonds. There is no dispute by anybody that this is the first knowledge that ever was conveyed to Ring of a sale. No one pretends that he was notified in advance that there was to be a sale, or, in fact, that a foreclosure had been begun.

About ten days after the receipt of this letter, and about the 18th of April, 1908, Mr. Ring came to New York and visited both Mr. Hervey and Mr. Brearley. He brought with him the letter of April 24th, 1907 (the year previous), in which Hervey had offered the exchange of the bonds, and took this to Hervey and asked for his bonds. Hervey told him he was too late, that he must go see Brearley, his trustee. He did so, and saw Mr. Brearley, and Brearley told him he had no bonds to give him in

exchange, that all he had was the cash to pay him $640 for the $5,000 of bonds he held.

Ring learned then, or shortly afterwards, that a Mr. Van Raalte (who was, I assume, similarly placed to him, or somewhat similarly placed) had begun a suit against the parties interested to set aside this sale, and, apparently, he rested, satisfied with whatever efforts Van Raalte was making to this end down until he learned that the Van Raalte suit had been settled. I think from the testimony that it was compromised. It appears that from the beginning Ring was acting under the advice of a New York lawyer named Maginnis; that he consulted Mr. Maginnis very shortly, if not immediately, after his interview of April 18th, 1908, with Brearley and Hervey, and that Maginnis continued to be his counsel down to the time that Mr. Enright, or McDermott & Enright, his New Jersey counsel, were employed; and it does appear that they were employed in the month of August, 1909, that there was a personal interview with them in the month of September of the same year, and that they filed the bill in this suit on the 27th day of October of the same year.

The purpose of the bill is in the alternative—either to have the foreclosure proceedings opened, the complainant herein made a defendant therein and the sale set aside, and a resale; or to have the defendants decreed to deliver to the complainant $5,000 of the bonds of a certain character and kind set forth in the bill.

Taking up the first of the two alternatives, my conclusion is that this complainant is not in a position to have that relief. It is true that it is a principle of equity that *cestuis que trust* are what are termed "necessary" parties to suits to foreclose the security in which they are interested, and which is held for their benefit; and the court will always, when appealed to, before decree, require that they be made parties. The reasons for this, broadly speaking, are twofold—*first,* that those beneficially interested may see to it that their rights are secured and protected, and *second,* that the defendant may, when bound by this decree, have the protection of having all the parties in interest before the court.

There are exceptions to the rule which requires that the *cestui que trustent* shall all be parties, and the limits of such exceptions

have never been, and probably never can be, precisely defined. *Willink* v. *Morris Canal, &c., Co.* (*Chancellor Haines, 1843*), *4 N. J. Eq.* (*3 Gr. Ch.*) *377; Williamson and Upton·* v. *New Jersey Southern Railroad Co.* (*Chancellor Runyon, 1874*), *25 N. J*. *Eq.* (*10 C. E. Gr.*) *13; Stevens* v. *Bosch* (*Vice-Chancellor Pitney, 1895*), *54 N. J. Eq.* (*9 Dick.*) *59; Camden Safe Deposit and Trust Co.* v. *Dialogue* (*Court of Errors and Appeals, 1909*), *75 N. J. Eq.* (*5 Buch.*) *600.*

Whatever may be meant or intended by speaking of them as "necessary parties" upon applications to the court before decree calling attention to their absence, it surely cannot be maintained that they are "necessary parties" in the sense that they are indispensable and that their absence invalidates the decree.

In a case in which the bonds were no more numerous, or very little more numerous than they are in this case, the court of appeals held that the trustee would have been justified in foreclosing without making any of the bondholders defendants. *Hackensack Water Co.* v. *De Kay* (*1883*), *36 N. J. Eq.* (*9 Stew.*) *552.* And see the language of Chief-Justice Green in *New Jersey Franklinite Co.* v. *Ames* (*Court of Errors and Appeals, 1859*), *12 N. J. Eq.* (*1 Beas.*) *507* (at *p. 509*). Counsel have not been able to find a case, nor have I, in which the omission of bondholders, one or more, has led the court to find the decree invalid. So recently as *Bushey* v. *National State Bank of Camden, 72 N. J. Eq.* (*2 Buch.*) *466*, we have a case in which a trustee foreclosed a mortgage in which there was only a single *cestui que trust* and he was not made a party. The chancellor (Magie) on page 468, in disposing of the suggestion that this rendered the proceedings invalid, seems to intimate that the defendants were the ones who might have objected thereto, or the purchaser at the sale (if he claimed that he was not getting the title he was entitled to because of· lack of parties); but he does not anywhere suggest that the proceedings were invalid because of the omission of the *cestui que trust,* the strong intimation being to the contrary.

Here, again, I do not propose to decide what the effect of omitting the *cestui que trust* is, except to the extent of deciding that

it does not render the proceedings invalid against those who were parties.

In this suit, therefore, we have Ring, the complainant herein, a bondholder, whose trustee foreclosed the mortgage in the other suit and did not make Ring a party. The utmost that Ring can claim, under such circumstances, is that his rights have not been foreclosed; and if they have not, he may, apparently, either file a bill to redeem, or perhaps take foreclosure proceedings himself. It may be that he will have to take them through the trustee, or compel the trustee to take them for him, if the mortgage forbids him to take them; but, in my present view, his utmost right would be to claim that the other suit did not affect him or his rights, and that he is, therefore, free to proceed as if there had been no other suit; or may redeem.

I do not say that these are his rights. I say that these are the utmost rights that he can claim. In *2 Jones Mort. (6th ed.)* § *1395,* the right is said to be limited to redemption.

He cannot claim, in my view, the right to have the foreclosure decree in the other suit opened and the sale set aside merely because he was a bondholder and was not made a party, unless he appeals directly in that suit, and shows good reason why he should now be admitted therein. By this I mean that if, in the course of that suit, injustice were done Ring, if, by adjudication therein, less was found to be due to the trustee for Ring than Ring could legitimately claim to be owing, or perhaps if less property were claimed to be under the lien than Ring thought should be claimed, it is possible that, being a beneficiary and being a party who had a right to be included in that suit, he could, even after decree, have the decree opened and come in; and, if there had been a sale and the complainant were the purchaser, and he were not in laches, he might be let in for that purpose.

But in the case in hand the only possible complaint that Ring makes with respect to the foreclosure proceedings, in which he was not a party, has nothing whatever to do with that suit, down to the time of decree, at least. He does not even suggest that the full amount, with interest, due him was not found to be due; and he does not claim that any property properly subject to the lien was omitted, and does not show that if he had been

made a party and had litigated, any other result could possibly be reached than was effected by the decree which was entered therein. His complaint is that he did not have notice of the sale; and he suggests (without, I think, directly alleging or testifying) that if he had had notice he would have attended and protected himself.

In passing, it should be observed that even if he were a party he would not be any better off in this respect, since there is no provision under our law that the parties are to be notified of the time and place of sale. They must ascertain these facts by diligence.

Here, again, if Ring (whose real complaint is with respect to the sale) had applied to this court promptly after the sale, and at a time when it would have been entirely possible to have held matters and restored them to the *status quo* before the sale, there would be ground for discussion, at least, with respect to his alleged right. But, under the circumstances of this case, I find that the complainant has placed himself entirely outside the pale entitling him to this relief. He was advised by the trustee that the trustee had been requested to foreclose. This surely put him upon notice that a foreclosure suit was likely. Very shortly after the sale he was notified that the sale had taken place, and of what was realized, and of what was coming to him out of it. He does not move for many months, and does not do so until it is absolutely impossible to restore things to the *status quo ante.*

I shall not elaborate upon either the facts or the law in this respect, but they lead me to the conclusion that Mr. Ring is not in a position where he is entitled to have the aid of equity to undo this sale and have a resale—even assuming that it is proper to grant such relief in this suit and not in the foreclosure suit, and that he had tendered himself willing to bid what the law would find it necessary for him to bid under the circumstances, which he does not do.

The mortgage, wholly or in part, was upon a leasehold interest which expired some short time after the sale. New leases to new parties have been made. There is no contradiction that various corporations were formed, and various stocks and bonds

were issued; and it sufficiently appears that it would be absolutely impossible to restore the *status quo ante* the sale.

This leaves for consideration the other alternative relief prayed for.

Broadly speaking, this is founded upon this theory—that the other parties to the suit, dealing with a subject-matter in which the complainant had a definite, specific interest, by bringing a foreclosure without making him a party, and by having a sale without making him a party or giving him any notice, and by purchasing the property themselves and forming new corporations, &c., have, with respect to a property in which he had an equal interest with them proportionately to his holdings, so dealt with the property and with him that he must now be held to have his proportionate right in the proceeds, whether they be stocks or bonds of the new corporations, or what not.

He was a bondholder to the extent of $5,000 under a mortgage recited to be for the equal benefit of all bondholders; all of the other bondholders (excepting himself and one other) entered into an arrangement for the purpose of selling the property under the old mortgage, buying it in, creating a new mortgage, and sharing in the same proportions in the new security that they did in the old.

There can be no doubt that, having given him an opportunity to come into this arrangement, if they had kept him advised of the foreclosure suit and the sale, so that he must strictly attend to his own interests and could look out for his own rights, no equity would obtain in his favor as against them.

But this admittedly is not the case. There is no evidence that he ever had any notice that a foreclosure suit had been begun until after it was over, and after the sale. He was clearly entitled to be made a party; and if they omitted him as a party, and omitted to give him notice, and did not give him notice until after the sale, I, as above stated, am of the opinion that he certainly has an equity. He claims that he is entitled to $5,000 par value of bonds which shall be a lien upon the identical property covered by the mortgage securing his old bonds, and that such new bonds must be identical in terms, &c., with the old bonds. This, he says, is the representation made to him by

Hervey concerning the new bonds. I do not think, under the circumstances, this complainant can now insist upon anything of that sort, even if he otherwise could. I find that his utmost right is to demand that he shall be permitted to share in the newly-created situation in the same way that the others similarly situated shared therein.

The jurisdiction of this court, with respect to trusts and concerning frauds, is complete. The jurisdiction for the relief to be afforded this complainant and the principles applied are elementary and require no citation of authorities. All of the bondholders of the New Auditorium Pier Company were in an identical position. The mortgage to their trustee, Brearley, was for the equal proportionate security of each bond. When the others, at Hervey's instigation, acting as he was with Tilyou, got together with Tilyou, Hervey and the trustee, and agreed to change the existing situation by causing the transfer of the mortgaged property to a new company and to have it issue bonds to the same amount, to the old bondholders, and to have Tilyou's New York corporation guarantee such bonds, this could only legally and equitably be done by treating all of the *cestui que trustent* alike. Undoubtedly, any bondholder of the old company (the New Auditorium Pier Company) who, being fully advised of the situation, chose to take his chances of protecting himself at a foreclosure sale, could properly be omitted from an arrangement which otherwise required the parties in interest to treat and protect all alike. Therefore, as I have heretofore said, I think that Ring would be entirely remediless if his trustee, or any one of the defendants (for they were all acting absolutely as a unit), had notified him of the fact that a foreclosure was in process, and that he must either exchange his bonds or take care of himself. But, in default of any such intimation to him, and in face of the suppression by all of the defendants (his trustee included) of any information which would put him upon notice that his rights were to be affected, I am clearly of opinion that the defendants must all be held to have been acting for all the bondholders represented by Brearley, the trustee, and that all such bondholders must, in equity, be held to be entitled to identically proportionate rights in the new securities.

It appears too completely from the proofs to require or permit of argument, that Hervey, Tilyou, Brearley, the trustee, and the various corporations that were formed to carry out their designs, were engaged simply in changing existing securities from one form to another. The property subject to the old mortgage was to be vested in a new company, and bonds of the new company were to take the place of those of the old company. It was not a case of foreclosure to obtain what the mortgaged property would bring for the benefit of the bondholders, although, incidentally, a foreclosure suit was part of their plan, because that was the best if not the only way that a satisfactory title could be obtained by the new company, but, in the plan as conceived and carried out, the foreclosure was a mere formality so far as the interests of the bondholders were concerned. Incidentally, also, such a foreclosure could properly have been utilizable to cut off the interests of any of the bondholders of the old company who, being fully advised of the proposed reorganization, chose to trust to the results of a sale in foreclosure rather than to join in the reorganization scheme. But to serve this last-mentioned purpose, I am clearly of the opinion that such bondholders, before they can be considered as having been cut off, must have been fully notified of all relevant facts. In default of such notification, and in face, as in this case at bar, of the suppression of such facts, the bondholders thus kept in ignorance have undoubtedly a right to claim identical treatment with all others in said scheme proportionate to the holdings of each.

All the parties to be affected are before the court; the property in question has not passed into the hands of anyone innocent of knowledge and participation. Mr. Hervey, Mr. Tilyou, the Pier Corporation of New York, the Pier Corporation of New Jersey, and Mr. Brearley, the trustee (that is, all of the defendants), were all combined and working to a common end. Except, if it be proved, that they were so combined and working to defraud Ring, their purpose was a perfectly legal, proper and legitimate one; but to make it such, they must be found to be equally—that is, proportionately—working for and responsible to all the *cestui que trustent*.

I so find.

The other alternative, if adopted, would lead to exactly a similar result; for surely Ring would be entitled to the aid of equity if it be found that his fellow-*cestui que trustent,* his trustee, and Messrs. Hervey and Tilyou, using the new corporations as their agents, had conspired and combined together to defraud Ring of his rights.

Whichever view is taken of the facts, the result is that Ring is entitled to identically proportionate interests with his fellow-*cestui que trustent,* and I so decide.

The proofs, as before stated, show that the company which, under the scheme, issued the new bonds, issued $110,000 thereof, $75,000 to take up the old bonds, and $35,000 to be sold for improvements. The old bondholders, as I read the proofs, received par for par in the new bonds. Ring should receive the same. If the proofs disclose that the old bondholders received more, Ring should receive his proportionate share identically with them.

It may be that the old bondholders were put to expense in carrying out the plan, and if so, Ring should pay his proportionate share thereof. This and the other details will be settled at the time of formulating the final decree, which will be done upon notice.

I do not think that there is any force in the claim of laches put forward by the defendants so far as it affects the right of the complainant as I have found it to exist. The doctrine is given full effect to so much of the bill as prays with respect to the interference with the foreclosure sale; but with respect to the complainant's right to equal treatment at the hands of the defendants, there is, in my view, no room or occasion for its application. No one has changed his position, or lost or forfeited any rights, or given up or secured any rights, no evidence has been lost or become unavailable; and no harm to any defendant is shown to have been occasioned by reason of the delay of the complainant in bringing his suit. I therefore find that the right heretofore found in favor of the complainant will not be denied because of the objection of laches.